UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| Robert W. Morris and LaRhonda Morris,<br><br>  Plaintiffs<br><br>v.<br><br>Equifax Information Services, LLC; Experian Information Solutions, Inc.; Ditech Financial, LLC; and Carrington Mortgage Services, LLC,<br><br>  Defendants | Case No.: 2:18-cv-01829-JAD-EJY<br><br>**Order Granting in Part Motion for Summary Judgment, Granting in Part Motion for Partial Summary Judgment, and Denying without Prejudice Motion to Seal**<br><br>[ECF Nos. 51, 53, 54, 55] |

  Robert and LaRhonda Morris sue loan servicer Carrington Mortgage Services, LLC, alleging that Carrington violated its duty under the Fair Credit Reporting Act (FCRA)[1] to reasonably investigate their dispute of the accuracy of information that it furnished about their mortgage loan to consumer reporting agencies.[2] The Morrises amended their complaint once as a matter of right and allege a single claim against Carrington under 15 U.S.C. § 1681s-2(b).[3] Carrington moves for summary judgment on the Morrises' amended claim, arguing that it fails at the liability and damage elements.[4] The Morrises move for summary judgment on their amended claim, too, but only as to liability,[5] and they seek to seal four exhibits that they provide in support of their summary-judgment motion.[6]

---

[1] 15 U.S.C. § 1681 et seq.
[2] *See generally* ECF No. 4.
[3] ECF Nos. 1 (original complaint), 4 (first-amended complaint).
[4] ECF No. 51.
[5] ECF Nos. 53, 55 (corrected).
[6] ECF No. 54.

I find that Carrington furnished incomplete and inaccurate information about the Morrises' loan to the consumer reporting agency but that if Carrington is held liable, it is responsible only for the damages that occurred after its FCRA duties arose. Genuine factual disputes preclude summary on all other issues raised by the parties. I therefore grant in part Carrington's motion for summary judgment and grant in part the Morrises' motion for partial summary judgment. I deny the Morrises' motion to seal without prejudice to Carrington's ability to move for that same relief with a properly supported motion. I direct that the seal be maintained on the documents pending a determination on that anticipated motion. Finally, I refer this case to the magistrate judge for a mandatory settlement conference.

## Background

The following facts are not in dispute. The Morrises voluntarily filed a joint petition under Chapter 13 of the Bankruptcy Code on December 17, 2010.[7] At the time of their petition, the Morrises owned and resided at 2008 Spruce Brook Drive in Henderson, Nevada.[8] To finance their purchase of that property, the Morrises took out a loan that was secured by a first-priority deed of trust on the property.[9] The Morrises were in default on the loan when they filed their bankruptcy petition.[10] The loan was initially serviced by BAC Home Loans Servicing, LP, which filed a proof of claim for the loan in the bankruptcy case totaling $363,657.82.[11] Later,

---

[7] ECF No. 55-6 (voluntary petition).
[8] *Id.* at 1.
[9] ECF No. 55-2 at ¶ 4 (LaRhonda's declaration); *accord* ECF No. 55-3 at ¶ 4 (Robert's declaration).
[10] ECF No. 51-1 (proof of claim contending arrearage of $22,638.16).
[11] *Id.*

2

but still during the bankruptcy case, the loan's servicing rights were assigned to Ditech Financial, LLC.[12]

The bankruptcy court confirmed the Morrises' (second) Chapter 13 plan on July 14, 2011.[13] The confirmed plan includes a provision for "Secured claims satisfied by the surrender of collateral."[14] The provision states that, "[a]s to real property secured claims, the entry of the confirmation order shall constitute an order modifying the automatic stay to allow the holder of a CLASS 5 secured claim to exercise its remedies under applicable non-bankruptcy law."[15] A table appears below that statement and provides, under a column titled "Creditor's Name/Collateral Description[,]" "BAC Home Loans Clam #12 (1st Mtg)[,]" "[h]ome and lot[,]" and the "2008 Spruce Brook Drive" property's full address. Under the next column, titled "Surrender in Full Satisfaction of Debt[,]" the plan provides "NO[.]"[16] Nothing is listed under the last column, which is titled "If No, Estimated Deficiency[.]"[17]

On December 5, 2013, the bankruptcy court found that the Morrises had "fulfilled all requirements under" their confirmed Chapter 13 plan and ordered that, under 11 U.S.C. § 1328(a), they are "discharged from all debts provided for by the Plan or disallowed under 11

---

[12] *See* ECF No. 55-1 at 10 (Clayton Gordon's deposition transcript).

[13] ECF No. 55-7 (order confirming Chapter 13 plan).

[14] *Id.* at 11 (emphasis omitted).

[15] *Id.* (emphasis omitted).

[16] *Id.* The parties do not address what this entry means. It could be construed as an emphatic "no" or shorthand for "no objection." I do not dwell on this ambiguous entry because both sides agree that the Morrises' confirmed Chapter 13 plan provides that they will voluntarily surrender the property to Carrington. *Compare* ECF No. 51 at 3, ¶ 6 (Carrington states in its summary-judgment motion that it is an "undisputed fact" that the Morrises "proposed to voluntarily surrender the [p]roperty to Carrington in their confirmed Chapter 13 plan"), *with* ECF No. 55 at 4, ¶ 7 (the Morrises state the same in their summary-judgment motion).

[17] ECF No. 55-7 at 11.

3

U.S.C. section 502, except any debt" that falls within the categories of debts enumerated in the order.[18]  Nearly four years after the discharge order, Ditech transferred the servicing rights on the loan to Carrington.[19]  Seven months later, when the Morrises applied to obtain a loan from Mann Mortgage, LLC, they discovered that Carrington had furnished information about the loan to consumer reporting agencies, including that four payments were 90 or more days past due, the past-due amount totaled $67,326, and that $451,290 was the total balance owed on the loan.[20]  Carrington also furnished information stating "foreclosure" under the heading titled "payment" and notes "Foreclosure proceedings started; Foreclosure started; Conventional Mortgage; Foreclosure initiated" in the comment section.[21]  Carrington did not furnish any information about the Morrises' bankruptcy case, including the discharge.[22]

## Discussion

**I.     Cross-motions for summary judgment [ECF Nos. 51, 53, 55 (corrected)]**

   **A.     Legal standard**

The principal purpose of the summary-judgment procedure is to isolate and dispose of factually unsupported claims or defenses.[23]  The moving party bears the initial responsibility of presenting the basis for its motion and identifying the portions of the record or affidavits that demonstrate the absence of a genuine issue of material fact.[24]  If the moving party satisfies its

---

[18] ECF No. 55-8 at 2 (discharge order).
[19] ECF No. 55-1 at 8 (Gordon's deposition transcript).
[20] ECF No. 55-9 at 3 (Bureau Express Trended Credit Data report).
[21] *Id.*
[22] *See id.*
[23] *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).
[24] *Celotex*, 477 U.S. at 323; *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).

4

burden with a properly supported motion, the burden then shifts to the opposing party to present specific facts that show a genuine issue for trial.[25] "When simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of"—and against—"both motions before ruling on each of them."[26]

### B. Furnisher liability under the FCRA

To prevail on a claim under 15 U.S.C. § 1681s-2(b), a plaintiff must establish that (1) a consumer report on him contains incomplete or inaccurate information, (2) he disputed that information with a consumer reporting agency, (3) the consumer reporting agency notified the information's furnisher about his dispute, and (4) the furnisher failed to comply with its obligations to investigate, report, and correct inaccuracies under § 1681s-2(b).[27]

The parties do not dispute that the second and third elements are met here. Rather, Carrington argues that it is entitled to summary judgment because the information that it furnished about the loan was accurate for the FCRA's purposes, it reasonably investigated the Morrises' dispute, and the Morrises cannot demonstrate that they were actually injured by or suffered damages because of Carrington's conduct. The Morrises argue that they are entitled to partial summary judgment because the information that Carrington furnished was inaccurate and it did not reasonably investigate their dispute. I begin with the parties' arguments about liability and conclude with Carrington's arguments about injury and damages.

---

[25] Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Auvil v. CBS 60 Minutes,* 67 F.3d 816, 819 (9th Cir. 1995).

[26] *Tulalip Tribes of Washington v. Washington*, 783 F.3d 1151, 1156 (9th Cir. 2015) (citing *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two,* 249 F.3d 1132, 1134 (9th Cir. 2001)).

[27] *See Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1153–57 (9th Cir. 2009).

5

1. **Carrington furnished incomplete and inaccurate information about the loan.**

Information is "incomplete or inaccurate" within the meaning of the FCRA if it is either "patently incorrect" or "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions."[28] Carrington furnished information that several of the loan's payments were 90 or more days past due, the past-due amount totaled $67,326, and the balance owed totaled $451,290.[29] It also furnished information that foreclosure proceedings had commenced. The Morrises claim that it was inaccurate for Carrington to furnish anything about the loan other than it had been "discharged in bankruptcy with a $0 balance due."[30] They reason that the information that Carrington furnished was inaccurate because their Chapter 13 discharge operates as a permanent injunction against the collection of debts to the extent of their personal liability and furnishing information about past-due amounts and a balance owed gives the false impression that they still are personally liable for the loan.[31]

Carrington argues that the disputed information was accurate because "there is no legal obligation to report a discharge on a credit report" and the "debt remained due and owing, even if no longer part of the bankruptcy."[32] To support its position, Carrington relies on the decisions of three district courts.[33] But the first case, *Basconcello v. Experian Information Solutions, Inc.*, is

---

[28] *Gorman*, 584 F.3d at 1163 (quotation omitted).

[29] ECF No. 55-9 at 3 (Bureau Express Trended Credit Data report).

[30] ECF No. 4 at ¶ 26 (internal quotations omitted). Carrington contends that the Morrises wanted it to furnish information that the property had been surrendered. ECF Nos. 61 at 7. I could not locate any evidence in the record showing that the Morrises made any such request.

[31] ECF No. 58 at 14–19.

[32] ECF No. 51 at 10.

[33] *Id.* at 10–11 (collecting cases).

6

distinguishable because it concerns the accuracy of information reported during the pendency of a bankruptcy case not, like here, the accuracy of information that was furnished years after a bankruptcy discharge.[34] Carrington's reliance on *Jugoz v. Experian Information Solutions, Inc.* is misplaced for the same reason.[35] And *Abeyta v. Bank of America* is similarly distinguishable because the plaintiff in that case did not allege that Bank of America had falsely furnished information that her debts "were still due and owing not only in July 2010, i.e., before they were discharged, but also at the time of the report, i.e., after they were discharged."[36]

Changing tack, Carrington argues that the disputed information was accurate because the loan was not discharged in bankruptcy.[37] "At the conclusion of a bankruptcy proceeding, a bankruptcy court typically enters an order releasing the debtor from liability for most prebankruptcy debts. This order, known as the discharge order, bars creditors from attempting to collect any debt covered by the order."[38] Here, the bankruptcy court's order discharged the Morrises from "all debts provided for by the plan . . . ."[39] The discharge order and 11 U.S.C. § 1328 enumerate several categories of debts that are excepted from discharge. Carrington does

---

[34] *Basconcello v. Experian Info. Sols. Inc.*, 2017 WL 1046969, at *5–7 (N.D. Cal. Mar. 20, 2017) (explaining that plaintiff's primary theory—that it is inaccurate to report pre-confirmation account balances and delinquencies during the pendency of bankruptcy, i.e., "prior to discharge"—is not novel and has been rejected by all judges in the district who considered it).

[35] *Jugoz v. Experian Info. Sols., Inc.*, 2017 WL 2720184, at *1 (N.D. Cal. June 23, 2017) (order determining dismissal motions in five actions alleging that defendants "failed to report [each plaintiff's] debts accurately in light of a pending bankruptcy").

[36] *Abeyta v. Bank of America*, 2016 WL 1298109, at *2 (D. Nev. Mar. 31, 2016).

[37] ECF No. 51 at 11–13.

[38] *Taggart v. Lorenzen*, ___ U.S. ___, 139 S. Ct. 1795, 1799 (2019) (citing 11 U.S.C. § 524(a)(2)).

[39] ECF No. 55-8 at 2. The discharge order enumerates several categories of debts that are excepted from discharge. Carrington does not argue that the loan falls into any of those categories.

7

not argue that the loan falls into any of those categories. Carrington agrees that the Chapter 13 plan calls for the Morrises to surrender the property,[40] so its beef isn't that the plan didn't provide for the loan. Rather, Carrington argues that the loan wasn't discharged because, in its view, the Morrises did not "voluntarily surrender" the property, i.e., didn't fulfil that requirement under the plan.[41] The Morrises point out[42] that this is an impermissible collateral attack on the discharge order, in which the bankruptcy court found that the debtors had "fulfilled all requirements under the plan."[43]

Even if Carrington's argument is construed as merely contesting whether the loan falls within the scope of the discharge order—a permissible argument—it would still fail. To show that there was no surrender, Carrington argues that the Morrises did not vacate the property, turnover the keys, or quitclaim the property to Carrington's beneficiary.[44] But the confirmed plan did not require the Morrises to do any of that. It quite clearly provided that, "[a]s to real property secured claims, the entry of the confirmation order shall constitute an order modifying the automatic stay to allow the holder of a CLASS 5 secured claim to exercise its remedies under

---

[40] ECF No. 51 at 3, ¶ 6.

[41] *Id.* at 12. Although Carrington repeatedly uses the phrase "voluntary surrender," neither the confirmed Chapter 13 plan nor the bankruptcy code uses the "voluntary" qualifier. *See* ECF No. 51-2 at 7 (discussing "secured claims satisfied by the surrender of collateral"); 11 U.S.C. § 1325(a)(5)(C) (providing that a plan may be confirmed if, "with respect to each allowed secured claim provided for by the plan[,] . . . the debtor surrenders the property securing such claim to such holder").

[42] ECF No. 58 at 6.

[43] *See* ECF No. 55-8 at 2. The Ninth Circuit has repeatedly noted that "persons subject to an injunctive order issued by a court with jurisdiction are expected to obey that decree until it is modified or reversed [by the issuing court], even if they have proper grounds to object to the order." *In re McGhan*, 288 F.3d 1172, 1180 (9th Cir. 2002) (quotation omitted).

[44] ECF Nos. 51 at 12, 61 at 2.

applicable non-bankruptcy law."[45] In other words, the plan put the ball in the creditor's court to act on its rights after the plan was confirmed. This is consistent with the fact that surrender in this context means "[t]he giving up of a right or claim."[46]

Carrington also argues that the property was not surrendered because the Morrises participated in foreclosure mediation and asked Carrington to approve the property's short sale, but those acts occurred years after the discharge order was entered,[47] so neither could have prevented the loan from falling within the discharge order's scope. Carrington has therefore failed to demonstrate that the loan was not discharged in bankruptcy.

Former U.S. Bankruptcy Judge Markell explained the effect that a bankruptcy discharge has on a debt in *In re Okosisi*. After a debtor receives a discharge in bankruptcy, "the debt remains[ ] but personal liability on the debt has been removed."[48] This means that "[l]iens on property of the [C]hapter 13 bankruptcy estate, if not properly addressed through the [C]hapter 13 plan, remain on the encumbered property, and once the automatic stay is lifted[,] . . . the creditor is free to exercise any nonbankruptcy collection remedies attributable to its valid security interest in the property."[49] Judge Markell also explained that "[t]he security for a debt in real property is typically evidenced by a mortgage or deed of trust on the property."[50] "These

---

[45] ECF No. 55-7.

[46] Surrender, *Black's Law Dictionary* (11th ed. 2019); *accord In re Sagendorph*, 562 B.R. 545, 552–53 (Bankr. D. Mass. 2017) (collecting authorities and defining "surrender" to mean "an offer to cede property rights to another").

[47] ECF No. 51 at 4, ¶¶ 10–12 (Carrington's "undisputed facts" include the Morrises' "[p]ost-discharge" conduct of electing to mediate foreclosure and seeking Carrington's consent to short-sell the property.

[48] *In re Okosisi*, 451 B.R. 90, 95 (Bankr. D. Nev. 2011).

[49] *Id.*

[50] *Id.*

security devices give the creditor the right to proceed against specific property in satisfaction of the underlying debt, and a properly recorded mortgage or deed of trust gives the creditor priority over subsequent creditors who take an interest in that land, whether that interest be a mortgage, deed of trust, judgment lien, mechanic's lien, or any other type of security interest."[51]

What this means here is that, upon entry of the discharge order, the Morrises' personal liability on the loan was removed and all creditors were permanently enjoined "against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any debt [on the loan] *as a personal liability of the debtor*."[52]  Carrington's security interest in the property remained, but Carrington didn't furnish only information about its security interest in the property to the consumer reporting agencies, i.e. the foreclosure notations.  Rather, it also furnished information about the fact and amount of past-due payments and the amount of the balance that was owed on the loan.  These items of information are badges of the existence of personal liability and can be expected to adversely affect credit decisions, so they are inaccurate for the FCRA's purposes.  Carrington also furnished incomplete information because it did not include that the Morrises' personal liability for the loan had been discharged in bankruptcy.  I therefore grant summary judgment in the Morrises' favor on the issue of whether Carrington furnished incomplete and inaccurate information about the mortgage loan and I deny Carrington's motion for summary judgment as to this same issue.

---

[51] *Id.* at 95–96.

[52] *Id.* at 96 (quoting, in parenthetical and with emphasis, 11 U.S.C. § 524(a)(2)).

### 2. The reasonableness of Carrington's investigation is genuinely disputed.

A furnisher's § 1681s-2(b) obligations "are triggered 'upon notice of dispute'—that is, when a person who furnished information to a CRA receives notice from the CRA that the consumer disputes the information."[53] Those obligations include conducting a reasonable investigation of the consumer's dispute,[54] reviewing all relevant information provided by the consumer reporting agency, and reporting the investigation's results to the consumer reporting agency or, if the investigation finds that the information is inaccurate or incomplete, reporting those results to all agencies that it furnished the information to.[55]

The Ninth Circuit explained in *Gorman v. Wolpoff & Abramson, LLP* that, because a furnisher's duties arise when it receives notice of a dispute from a consumer reporting agency, "[t]he pertinent question" is "whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the [agency's] notice of dispute."[56] But, it cautioned, the fact "that the notice determines the nature of the dispute to be investigated" does not "suggest that it also cabins the scope of the investigation once

---

[53] *Gorman*, 584 F.3d at 1154 (quoting 15 U.S.C. § 1681i(a)(2)).

[54] The Ninth Circuit has interpreted § 1681s-2(b)(1)(A) as requiring that a furnisher conduct a "reasonable" investigation, recognizing, as "the Fourth Circuit first noted[,] that the plain meaning of the term 'investigation' is a 'detailed inquiry of systematic examination,' [that] necessarily 'requires some degree of careful inquiry.'" *Gorman*, 584 F.3d at 1155 (quoting *Johnson v. MBNA Am. Bank, N.A.*, 357 F.3d 426, 429–31 (4th Cir. 2004) (quoting *Am. Heritage Dictionary* 920 (4th ed. 2000))).

[55] 15 U.S.C. § 1681s-2(b)(1)(A)–(D). Subparagraph E details a furnisher's conduct when a disputed item of information is found to be inaccurate, incomplete, or cannot be verified after any reinvestigation.

[56] *Gorman*, 584 F.3d at 1157.

undertaken."[57] The Ninth Circuit also cautioned that summary judgment on the question of reasonableness, which is typically the province of the jury, "is appropriate when only one conclusion about the conduct's reasonableness is possible."[58]

It appears from this record that the consumer reporting agency forwarded the Morrises' dispute letters to Carrington when it notified that furnisher about their disputes.[59] The letters reveal that the nature of the Morrises' dispute was three-fold. The letters state that it is inaccurate to report late payments because the Morrises were "paying as required" and also because they "surrendered this property to Ditech in [their] [C]hapter 13 and performed all obligations owed to Ditech after filing [their] Chapter 13 . . . ."[60] Each letter further states that it is inaccurate "to state that is [sic] still owe a balance of $455,930 and am past due $72,774, since this debt was discharged in my Chapter 13."[61] Robert Morris attached copies of the Morrises' bankruptcy petition, confirmation order, confirmed plan, and discharge order to his dispute letter.[62] LaRhonda Morris did not attach those documents to her dispute letter but stated in it that she "filed a Chapter 13 bankruptcy in the District of Nevada on 12/17/2010, Case No. 10-33523 and received . . . [a] discharge on 12/05/2013."[63] Robert stated the same information in his

---

[57] *Id.* at n.11.

[58] *Id.* at 1157 (quotation omitted).

[59] *See* ECF No. 51-10 at 3, 5 (Automated Consumer Dispute Verification (ACDV) response stating that an image was associated with the notice that Experian sent Carrington and that, [b]y submitting this ACDV, you certify that you have reviewed and considered all associated images").

[60] ECF No. 51-9 at 2 (Robert dispute letter dated July 30, 2018); *accord id.* at 3 (LaRhonda dispute letter dated July 30, 2018).

[61] *Id. at 2*; *accord id.* at 3.

[62] ECF No. 55-3 at 5, ¶ 14.

[63] ECF No. 51-9 at 3.

12

dispute letter, too.[64]  The Morrises' dispute letters contained enough information to alert Carrington to the specific nature of their claim: it is inaccurate to report a balance and past-due payment obligations because the Morrises' personal liability for the loan was discharged in bankruptcy after they surrendered the property under the terms of their confirmed plan.

Carrington's Vice President Elizabeth Ostermann explains what Carrington did to investigate the Morrises' dispute.  According to Ostermann, "Carrington personnel reviewed the 2018" Credit Reporting Resource Guide (CRRG) "together with its own policies and procedures for guidance as to whether or not the tradeline needed to be updated, and if so, how the delinquent loan should be reported."[65]  "Based on a review of the CRRG, and its own internal policies and procedures, Carrington determined that the [p]roperty was not (yet) surrendered, and that Carrington should continue reporting the loan balance as due until the [p]laintiffs conveyed the [p]roperty or surrendered the physical possession to Carrington."[66]

But Ostermann doesn't expressly declare that Carrington investigated the Morrises' dispute that the loan had been discharged in bankruptcy.[67]  Carrington provides no other evidence to show that it investigated that issue.  There is no evidence that either the CRRG or Carrington's "own internal policies and procedures" contain information that could allow its personnel to make that determination.[68]  Carrington argues that the CRRG does not account for

---

[64] *Id.* at 2.

[65] ECF No. 52 at 2, ¶ 14.

[66] *Id.* at 2–3, ¶ 15.

[67] Ostermann's phrasing implies that Carrington concluded without investigating that the loan was not discharged because the property wasn't surrendered how Carrington wanted.

[68] The Morrises provide a copy of Carrington's "Customer Research Policy," but it is heavily redacted. ECF No. 54-3 (sealed).  The Morrises also provide excerpts of the CRRG, but they are limited and do not address this issue.  *See* ECF No. 55-21.

this scenario,[69] but that gap in coverage is precisely why a reasonable jury could find that simply reviewing that industry guide and equally silent company policies was not a reasonably sufficient investigation of the Morrises' dispute.[70]

The Morrises also move for summary judgment on this issue, arguing that Carrington's investigation was unreasonable because its ultimate conclusion was wrong.[71] But "[a]n investigation is not unnecessarily unreasonable because it results in a substantive conclusion unfavorable to the consumer, even if that conclusion turns out to be inaccurate."[72] The Morrises do not provide evidence to show what Carrington did or did not do to investigate their dispute. They also do not provide argument to show that Carrington's policies and procedures for resolving customer disputes are unreasonable. Nor do the Morrises address whether the steps that Ostermann declares Carrington took to investigate their dispute were reasonable. The most that the Morrises offer are arguments attacking Ostermann's credibility and the weight of her testimony.[73] But those arguments are the province of the fact finder at trial, not a judge

---

[69] *See, e.g.*, ECF No. 51 at 6, ¶ 24 (Carrington's "undisputed facts" include that "[t]he CRRG does not address the scenario in this case; where the borrower proposes to surrender the property in a confirmed plan, obtains an order for discharge; but then never surrenders possession, in contravention of the [p]lan and the parties' expectations").

[70] Indeed, as the Ninth Circuit concluded in *Espinosa v. United Student Aid Funds, Inc.*, "[a] creditor is not free to violate the discharge injunction because it has doubts as to the validity of the discharge. If the creditor believes the discharge is defective, it may petition the bankruptcy court to reopen and set aside the judgment under Rule 60(b), but it may not commence collection proceedings unless and until the court grants such relief." 553 F.3d 1193, 1205 (9th Cir. 2008).

[71] ECF No. 55 at 26–27 (arguing what Carrington "should have" furnished had it reached the correct conclusion that the loan was discharged in bankruptcy).

[72] *Gorman*, 584 F.3d at 1161.

[73] ECF No. 58 at 21–24 (attacking Ostermann's declaration as conclusory and contrary to the testimony of Carrington's FRCP 30(b)(6) witness Clayton Gordon); *accord* ECF No. 62 at 8. The Morrises' passing mention that Ostermann's declaration is "self-serving" is not an argument and the Morrises don't separately move to strike that evidence.

14

determining summary-judgment motions. So I also deny the Morrises' summary-judgment motion as to this issue.

### 3. Injury and damages

Carrington argues that it is entitled to summary judgment because the Morrises cannot demonstrate that they suffered an actual injury or incurred actual damages from the information that Carrington furnished. It also argues that it is not liable for any damages stemming from any of the three credit denials that the Morrises experienced.[74] Carrington contends that the Morrises cannot "make out a prima facie case showing that they have suffered an injury in fact" because there is no scenario in which all negative indicators would have been removed from loan's tradeline on credit reports.[75] To support this theory, Carrington relies on its expert John Ulzheimer, who testified in deposition that if the loan's tradeline was updated how the Morries sought in their dispute letters, then the balance and past-due amounts would be zero but "[t]here would be a notation with the account indicating that it was included in the plaintiffs' Chapter 13 bankruptcy" and the foreclosure notations would remain if they had actually been initiated.[76] Carrington argues that the foreclosure and bankruptcy indicators would have caused creditors to deny the Morrises' applications.

The Morrises respond that Carrington's theory fails to account for the fact that the loan would have been purged from their credit reports had Carrington reasonably investigated their dispute and furnished bankruptcy indicators and, thus, the correct date for their "date of first

---

[74] ECF No. 51 at 15–19.
[75] *Id.* at 15.
[76] ECF No. 51-16 at 4 (John Ulzheimer's deposition transcript at 138:21–140:04).

15

default."[77]  Carrington furnished April 30, 2016, as the date of first default.[78]  The Morrises contend that Carrington should have furnished the date they filed their bankruptcy petition—December 17, 2010.[79]  To show that is the date that Carrington should have furnished, the Morrises provide excerpts from the 2018 CRRG[80] and deposition testimony from Carrington's FRCP 30(b)(6) witness Clayton Gordon.[81]  The Morrises argue that, had Carrington furnished bankruptcy indicators and, thus, the correct date of first default, that would have caused consumer reporting agencies to purge the loan from reports on the Morrises beginning on December 18, 2017.  This means that the loan would not have been included on consumer reports that were pulled by the Morrises' potential lenders in April 2018[82] and November 2018.[83]

Carrington does not directly address the Morrises' argument in its reply.[84]  Rather, it provides authority to show that a voluntary surrender in bankruptcy does not transfer ownership in the property,[85] but those authorities do not stand for the proposition that a creditor can furnish

---

[77] ECF No. 58 at 26.

[78] *See* ECF No. 58-2 at 21–22 (Gordon's deposition transcript at 153:20–154:05); *accord* ECF No. 55-17 at 2 (ACDV response as to Robert); ECF No. 55-18 at 2 (ACDV response as to LaRhonda).

[79] ECF No. 58 at 26.

[80] ECF No. 55-21.  Although the Morrises have not demonstrated that their bankruptcy petition date is the correct date of first default under the CRRG, Carrington's admission that the loan was in default when the Morrises filed their bankruptcy petition and they never paid another cent toward it, combined with the other two options in the CRRG's "hierarchy" for determining this date, demonstrate that it could not have been any later than December 17, 2010.

[81] ECF Nos. 55-1, 54-1 (sealed).

[82] Pulled by mortgage broker Mann Mortgage, LLC.

[83] Pulled by lenders NBKC Bank and Ollo Card Services.

[84] *See generally* ECF No. 61.

[85] *Id.* at 4 (citing *Batali v. Mira Owners Ass'n*, 2015 WL 7758330 (Bankr. App. 9th Cir. Dec. 1, 2015), *abrogated by Goudelock v. Sixty-01 Ass'n of Apartment Owners*, 895 F.3d 633 (9th Cir. 2018)).  Vesting is what transfers title in property.

16

information about a discharged mortgage loan if the debtor maintains an ownership interest in the property that secured the loan. Carrington provides no other authorities to connect those dots, nor does it provide any authority to show that it could furnish just foreclosure indicators. The Morrises have raised a genuine dispute of fact that the loan would have been purged from their consumer files had Carrington preformed a reasonable investigation of their dispute.

Carrington also argues that it is not liable for any damages stemming from the (1) Mann Mortgage credit denial, because that occurred before its duty to investigate arose; or (2) two later credit denials, because the Morrises did not specifically plead them. The latter argument is a non-starter: the Morrises allege that they were denied credit "opportunities"[86] because of Carrington's conduct and details about those denials clearly came out during discovery because Carrington attached evidence about each denial to its summary-judgment motion.[87] If Carrington is found to have violated § 1681s-2(b), then it is liable for any actual damages that stem from the two later credit denials.

Finally, Carrington argues that it cannot be liable for damages that stem from a credit denial that occurred before its duty to investigate arose. The three cases that Carrington cites in support do not stand for this narrow proposition,[88] neither does the case that the Morrises cite for the opposite position.[89] The plain language of the FCRA provides that a consumer may recover the sum of any actual damages he sustained "as a result of the failure" of a person to comply with any requirement imposed on him or her under the FCRA.[90] Logically, any damages that the

---

[86] ECF No. 4 at ¶ 85.
[87] ECF Nos. 51-12, 51-13, 51-17.
[88] ECF No. 51 at 16 n.83.
[89] ECF No. 58 at 26–27.
[90] 15 U.S.C. § 1681n(a)(1)(A) (willful); *accord* 15 U.S.C. § 1681o(a)(1) (negligent).

Morrises incurred from a credit denial that occurred before Carrington's FCRA duties arose could not have been sustained by them "as a result of the failure" of Carrington to discharge its duties. Thus, Carrington is entitled to summary judgment on this narrow issue of damages.

## II.    Motion to seal [ECF No. 54]

The Morrises move to seal four documents that they provided in support of their motion for partial summary judgment.[91] The motion is based solely on the fact that Carrington produced and designated the documents as "confidential" during discovery and the parties' protective order requires that the Morrises to file them under seal.[92] But the fact that parties agreed to keep documents confidential during litigation is not a sufficient basis for a court to seal those documents from public view when they are used in motion practice. "The public has a 'general right to inspect and copy public records and documents including judicial records and documents.'"[93] "Although the common law right of access is not absolute, '[courts] start with a strong presumption in favor of access to court records.'"[94] "A party seeking to seal judicial records can overcome the strong presumption of access by providing 'sufficiently compelling reasons' that override the public policies favoring disclosure."[95] "When ruling on a motion to seal court records, the district court must balance the competing interests of the public and the party seeking to seal judicial records."[96]

---

[91] ECF No. 54.

[92] *Id.*

[93] *In re Midland Nat. Life Ins. Co. Annuity Sales Practices Litig.*, 686 F.3d 1115, 1119 (9th Cir. 2012) (quoting *Nixon v. Warner Commcns., Inc.*, 435 U.S. 589, 597 (1978)).

[94] *Id.* at 1119 (quoting *Foltz v. St. Farm Mut. Auto. Ins. Co.*, 331 F.3d 1122, 1135 (9th Cir. 2003)).

[95] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[96] *Id.* (citing *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1179 (9th Cir. 2006)).

"To seal the records, the district court must articulate a factual basis for each compelling reason to seal[,] [which] must continue to exist to keep judicial records sealed."[97]  The Ninth Circuit has, however, "'carved out an exception to the presumption of access' to judicial records" that is "'expressly limited to' judicial records 'filed under seal when attached to a non-dispositive motion.'"[98]  "Under the exception, 'the usual presumption of the public's right is rebutted[,]'" so "a particularized showing of 'good cause' under [FRCP] 26(c) is sufficient to preserve the secrecy of sealed discovery documents attached to non-dispositive motions."[99]

Although the Morrises move to seal the documents, the court assumes that Carrington is the proponent of sealing them because they consist of Carrington's policies and procedures and deposition testimony from its FRCP 30(b)(6) witness about them.  But Carrington did not respond to the Morrises' motion at all, let alone with analysis under the above authorities demonstrating why the documents should be sealed.  I therefore deny the Morrises' motion to seal without prejudice to Carrington's ability to move for that same relief with a properly supported motion.  In moving to seal, Carrington need not refile the documents but may simply refer to where they are on the docket.[100]

---

[97] *Id.* (citing *Kamakana*, 447 F.3d at 1179; *Foltz*, 331 F.3d at 1136).

[98] *Id.* (quoting *Foltz*, 331 F.3d at 1135).

[99] *Id.* (quoting *Phillips ex rel. Estates of Byrd v. Gen. Motors Corp.*, 307 F.3d 1206, 1213 (9th Cir. 2002); *Foltz*, 331 F.3d at 1135, 1138).

[100] Gordon's testimony is at ECF No. 54-1 (sealed), the Credit Reporting Policy is at ECF No. 54-2 (sealed), the Customer Research Policy is at ECF No. 54-3 (sealed), and the Credit Dispute Research Procedure is at ECF No. 54-4 (sealed).

**Conclusion**

Accordingly, IT IS HEREBY ORDERED that Carrington's motion for summary judgment **[ECF No. 51] is GRANTED in part**: the Morrises may not pursue damages stemming from the Mann Mortgage credit denial. Carrington's motion is **DENIED** in all other respects.

IT IS FURTHER ORDERED that the Morrises' motion for partial summary judgment **[ECF Nos. 53, 55 (corrected)] is GRANTED in part**: Carrington furnished incomplete and inaccurate information about the Morrises' loan to consumer reporting agencies. The Morrises' motion is **DENIED** in all other respects.

IT IS FURTHER ORDERED that the Morrises' motion to seal **[ECF No. 54] is DENIED without prejudice** to Carrington's ability to move for that same relief in a properly supported motion by **May 8, 2020**. The Clerk of Court to directed to **maintain the seal** on the motion at **ECF No. 54** and all of its subparts.

IT IS FURTHER ORDERED that **this case is REFERRED to the magistrate judge for a mandatory settlement conference**. The parties' obligation to file their joint pretrial order is **STAYED** until ten days after that settlement conference.

_____
U.S. District Judge Jennifer A. Dorsey
April 23, 2020